UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. __15-20820-CR-BLOOM(s)__
18 U.S.C. § 1349
18 U.S.C. § 371
18 U.S.C. § 2
18 U.S.C. § 982



UNITED STATES OF AMERICA

vs.

KHALED ELBEBLAWY,

Defendant.
_____/

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Superseding Indictment,

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

3.  "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4.  Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5.  CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

2

## Part A Coverage and Regulations

### Reimbursements

6.  The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if:

   a.  the patient was confined to the home, also referred to as homebound;

   b.  the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

   c.  the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7.  HHAs were reimbursed under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8. In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9. Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10. Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the

4

patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11. Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## Special Outlier Provision

12. Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified HHA. The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibit one HHA merely serving as a billing mechanism for another agency.

13. For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary. Additionally, for beneficiaries for whom occupational or physical therapy was medically

necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14. While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

### The Defendant and Related Entities

15. Willsand Home Health Agency, Inc. ("Willsand") was incorporated on or about July 10, 2000, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries.

16. JEM Home Health Care, LLC ("JEM") was a limited liability Florida corporation incorporated on or about May 29, 2003, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries.

17. Healthy Choice Home Health Services Inc. ("Healthy Choice") was incorporated on or about October 4, 2007, and did business in Miami-Dade County, Florida, purportedly providing home health care and physical therapy services to eligible Medicare beneficiaries.

18.     **KHALED ELBEBLAWY**, a resident of Broward County, was an office manager at Willsand, an owner of JEM, and an owner/manager of Healthy Choice.

19.     Co-conspirator Eulises Escalona, a resident of Monroe County, was an owner of Willsand and JEM.

20.     Co-conspirator A, a doctor, was paid kickbacks and bribes to refer Medicare beneficiaries to Willsand, JEM, and Healthy Choice.

21.     Co-conspirator B was an owner of Healthy Choice.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.      The General Allegations section of the Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

2.      From in or around 2006, and continuing through in or around May of 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**KHALED ELBEBLAWY,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Eulises Escalona, Co-conspirator A, Co-conspirator B, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

   a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment

for health care benefits, items, and services, in violation of Title 18 United States Code, Section 1347; and

        b.    to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.    It was a purpose of the conspiracy for **KHALED ELBEBLAWY** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) offering and paying kickbacks and bribes in return for referring Medicare beneficiaries to serve as patients at Willsand, JEM, and Healthy Choice; (b) submitting and causing the submission of false and fraudulent claims to Medicare for services that were not medically necessary, not eligible for Medicare reimbursement, and not provided to Medicare beneficiaries; and (c) concealing and causing the concealment of the submission of false and fraudulent claims to Medicare.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things:

4.    In or around March of 2009, **KHALED ELBEBLAWY** falsely certified to Medicare that JEM would comply with all Medicare rules and regulations, including that JEM would refrain from violating the federal Anti-Kickback statute.

5. Before and after March of 2009, **KHALED ELBEBLAWY** and his co-conspirators paid kickbacks to co-conspirator patient recruiters and doctors in exchange for referring Medicare beneficiaries to Willsand, JEM, and Healthy Choice to serve as patients.

6. **KHALED ELBEBLAWY** and his co-conspirators submitted and caused the submission of at least approximately $56 million in false and fraudulent claims to Medicare via interstate wire communications, seeking payment for home health services purportedly provided to beneficiaries by Willsand, JEM, and Healthy Choice, when, in fact, such services were procured by bribes and kickbacks, not medically necessary, and not provided.

7. As a result of these false and fraudulent claims, **KHALED ELBEBLAWY** caused Medicare to make payments to Willsand, JEM, and Healthy Choice.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Defraud the United States and Pay Health Care Kickbacks
### (18 U.S.C. § 371)

1. The General Allegations section of the Superseding Indictment is realleged and incorporated by reference as though fully set forth herein.

2. From in or around 2006, and continuing through in or around May of 2013, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**KHALED ELBEBLAWY,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other and Eulises Escalona, Co-conspirator A, Co-conspirator B, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

 a. to defraud the United States by impairing, impeding, obstructing, and

9

defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and

    b.  to knowingly and willfully offer and pay remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

## PURPOSE OF THE CONSPIRACY

  3.  It was a purpose of the conspiracy for **KHALED ELBEBLAWY** and his co-conspirators to unlawfully enrich themselves by, among other things: (1) offering and paying kickbacks and bribes in return for referring Medicare beneficiaries to Willsand, JEM, and Healthy Choice; and (2) submitting and causing the submission of claims to Medicare for home health services that Willsand, JEM, and Healthy Choice purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purposes of the conspiracy included, among other things:

  4.  **KHALED ELBEBLAWY** paid kickbacks in return for the referral of Medicare beneficiaries to serve as patients at Willsand, JEM, and Healthy Choice.

  5.  **KHALED ELBEBLAWY** caused Willsand, JEM, and Healthy Choice to submit claims to Medicare for home health services purportedly provided to the recruited beneficiaries.

6. As a result of these claims, **KHALED ELBEBLAWY** caused Medicare to make payments to Willsand, JEM, and Healthy Choice.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purposes, at least one of the conspirators committed and caused to be committed in the Southern District of Florida, at least one of the following overt acts, among others:

1. On or about April 26, 2011, **KHALED ELBEBLAWY** and Co-Conspirator B caused Healthy Choice to submit a claim to Medicare for beneficiary A.V. in the approximate amount of $6,200.

2. On or about June 27, 2011, **KHALED ELBEBLAWY** and Co-Conspirator B caused Healthy Choice to submit a claim to Medicare for beneficiary A.R. in the approximate amount of $2,800.

3. On or about July 1, 2011, **KHALED ELBEBLAWY** and Co-Conspirator B caused Healthy Choice to submit a claim to Medicare for beneficiary P.R. in the approximate amount of $2,500.

4. On or about July 27, 2011, **KHALED ELBEBLAWY** and Co-Conspirator B caused Healthy Choice to submit a claim to Medicare for beneficiary O.A. in the approximate amount of $3,900.

5. On or about August 26, 2011, **KHALED ELBEBLAWY** withdrew approximately $7,500 in cash from an account he held at Chase Bank.

6. On or about January 20, 2012, **KHALED ELBEBLAWY** negotiated a check, numbered 2292, in the approximate amount of $7,500, written from Healthy Choice's bank account to **KHALED ELBELAWY**.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
## (18 U.S.C. § 982)

1. The General Allegations section and the allegations set forth in Counts 1 and 2 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant, **KHALED ELBEBLAWY**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Sections 371 or 1349, as alleged in this Superseding Indictment, the defendant, **KHALED ELBEBLAWY**, shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense pursuant to Title 18, United States Code, Section 982(a)(7).

3. The property which is subject to forfeiture includes, but is not limited to, the sum of at least $40 million, which represents the gross proceeds of the offenses alleged in the Superseding Indictment.

4. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code Section 982(b)(1).

A TRUE BILL

_____
FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY


_____
GEJAA GOBENA, DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE


_____
VASANTH R. SRIDHARAN
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

| UNITED STATES OF AMERICA | CASE NO. 15-20820-CR-BLOOM(s) |
|---|---|
| vs. | |
| KHALED ELBEBLAWY, | **CERTIFICATE OF TRIAL ATTORNEY*** |
| Defendant._____ / | **Superseding Case Information:** |

**Court Division:** (Select One)

| | | New Defendant(s) | Yes ____ | No __X__ |
|---|---|---|---|---|
| __X__ Miami | ____ Key West | Number of New Defendants | | |
| ____ FTL | ____ WPB ____ FTP | Total number of counts | __2__ | |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) __No__
   List language and/or dialect _____

4. This case will take __5__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I    0 to 5 days        __X__       Petty       ____
   II   6 to 10 days       ____        Minor       ____
   II   11 to 20 days      ____        Misdem.     ____
   IV   21 to 60 days      ____        Felony      __X__
   V:   61 days and over   ____

6. Has this case been previously filed in this District Court? (Yes or No) Yes
   If yes:
   Judge: __Bloom__    Case No. __15-20456-CR; 15-20820-CR__
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No) __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No) __No__

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    ____ Yes  __X__ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    ____ Yes  __X__ No

VASANTH SRIDHARAN
DOJ TRIAL ATTORNEY
Court No. A5502104

*Penalty Sheet(s) attached

REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:** __KHALED ELBEBLAWY__

**Case No:** __15-20820-CR-BLOOM(s)__

Count #:  1

__18 U.S.C. § 1349__

__Conspiracy to Commit Health Care Fraud and Wire Fraud__

**\*Max Penalty**: Twenty (20) years' imprisonment.

Count #:  2

__18 U.S.C. § 371__

__Conspiracy to Defraud the United States and Pay Health Care Kickbacks__

\*Max Penalty:  Five (5) years' imprisonment.

Count #:

\*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**